## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## DANIEL CONSTRUCTION COMPANY, Respondent.

### No. 8078.

United States Court of Appeals Fourth Circuit.

Argued June 1, 1960.

Decided Aug. 25, 1960.

Melvin J. Welles, Atty., National Labor Relations Board, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Richard H. Frank, Atty., National Labor Relations Board, Washington, D. C., on brief), for petitioner.

Robert S. Galloway, Jr., and W. Francis Marion, Greenville, S. C. (Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This case comes before us on the petition of the National Labor Relations Board for the enforcement of an order

wherein it directed the Daniel Construction Company to abstain from encouraging membership in the International Hod Carriers' Building and Common Laborers' Union, AFL–CIO, Local 1392, and also to make whole one Joseph T. Mattingly from any loss of pay resulting from his discharge by the corporation, which the Board found was based on lack of membership in the union in violation of § 3(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The petition for enforcement is resisted on the ground that in making its findings the Board did not take into account certain material undisputed facts and hence its decision was not based on the record considered as a whole within the meaning of § 10(e) of the statute, 29 U.S.C.A. § 160(e) and § 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(e). See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487, 488, 71 S.Ct. 456, 95 L.Ed. 456.

The Daniel Construction Company, a South Carolina corporation, is engaged in the building and construction industry as a general contractor and has substantial building projects in various parts of the United States. In 1958 it had a contract to construct a plant for the Dewey and Almy Chemical Company near Owensboro, Kentucky. Eubert R. Davis, superintendent in charge of the work, found that union men living in the community constituted a good source of labor supply but his company had no collective bargaining contracts with the unions for the job and, accordingly, he arranged in advance with the Employment Security Division of the Department of Economic Security of the State to supply his needs. To this end he made contact with John A. Robertson, manager of the Employment Security Division in Owensboro, to send him qualified workers. When he needed men he also called union headquarters in Owensboro and informed them that he had placed or was about to place a request with Robertson for men and asked the union to refer unemployed men to the State agency. In this way unemployed workers qualified for the necessary jobs made applications to Robertson and were referred by him to Davis. In the course of these dealings between Davis, representing the employer, and Robertson, manager of the State of Kentucky Employment Security Division, no mention was made of union membership. Davis did not request union men but only men qualified to do the work and Robertson did not confine himself to union men in referring workers to Davis for employment. Robertson knew that Davis had also communicated his wants to union headquarters but sent to Davis qualified men as they applied for work, whether they were members of the union or not. The record does not show how many of the referrals were union and how many non-union men but, since Davis notified the union as well as Robertson when he needed men, it may be inferred that the majority of the employees belonged to the union.

During the course of the work the complainant, Joseph T. Mattingly, was employed as a truck driver on or about July 1, 1958. He was a member of Teamsters Local Union No. 215 but the record does not show how he got the job. It was not shown that he was employed in the manner above described or that his employer inquired or knew that he was a union man when he was hired or when he was laid off. He continued in this job for several months but did not work continuously since the job did not require a truck driver at all times. According to Davis, Mattingly's services were not entirely satisfactory since he was slow, and on one occasion burned out the clutch of a truck. However, he was not discharged but was called to work from time to time when he was needed. In the early part of September, according to the testimony of Davis, he failed to answer his telephone when he was needed. Davis thereupon called Robertson to send him a man who could do both truck driving and laborers' work. He also called the business agent of the Hod Carriers' and Laborers' Union to procure

a man for him. The business agent in turn telephoned William E. Gardner and told him to apply to Robertson for employment. He did so and was employed. He was a member of both the Teamsters and of the Laborers' unions, and since he applied soon after Davis communicated with the Laborers' union, Davis may have had reason to infer that he was a member of that Laborers' union, but there is no evidence that Davis knew that Gardner was a member of the Teamsters union or that Davis inquired into Gardner's union relations at the time he was employed.

A few days after Gardner was employed Mattingly went to the job site to inquire if he was needed and was paid off. He testified that he was told that he got "around too slow." Davis testified, with respect to this interview, that he told Mattingly that he had telephoned him unsuccessfully and had replaced him with a satisfactory man. Mattingly then reported the occurrence to Glen Wilkinson, assistant business representative of the Teamsters Union, and the two men called to see Davis about Mattingly's discharge. According to the testimony on behalf of the complainant, Davis expressed the view that Mattingly was not a good truck driver and had burned out a clutch and that Gardner was a better driver and could work as a member of both unions. Mattingly also testified that Davis agreed to rehire him if he became a member of the Laborers' union. Wilkinson was not asked in regard to the last statement and did not verify it. However, he threatened Davis with trouble on the job if Mattingly was not reinstated. Davis on his part testified that he had telephoned Mattingly without success, that Mattingly was slow and had burned out a clutch, and hence Davis had replaced him with a more satisfactory man. Davis denied that he had offered to rehire Mattingly if he joined the Laborers' union, and he further testified that he had never made union

membership a condition of employment, and had never questioned applicants for employment as to their union connections.

It will be observed that the narrow question for the Board's decision was whether Mattingly lost his place because he did not belong to the Laborers' union or because his employer found his services unsatisfactory and replaced him with a better man. The Board wrote no opinion in the case but merely adopted the conclusions set forth in the Trial Examiner's report and his recommendation that the employer abstain from encouraging membership in the union and, also, make good to Mattingly any loss he may have suffered from his discharge. The Trial Examiner on his part accepted the testimony of the Board's witnesses—particularly the testimony of Mattingly that Davis agreed to reinstate him if he would join the Laborers' union—as substantial evidence that the company was engaged in encouraging union membership when it discharged Mattingly and hired Gardner.

If there were no more to the case it would be our duty to enforce the Board's order, under the provisions of § 10(e) of the statute, that the findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive.[1] The Trial Examiner's report, however, shows that he did not observe the injunction of the statute to consider the record as a whole. On the contrary, the reasons he gave for rejecting the testimony of Davis clearly show that in important respects he failed to give consideration to the admitted facts of the case and stated conclusions which the evidence does not support.

It must be borne in mind that no labor dispute occurred between the management on one hand or the workers or their representatives on the other in the prosecution of the Owensboro contract. There was no attempt on the part of

1. N. L. R. B. v. School-Timer Frocks, Inc., 4 Cir., 224 F.2d 336–337; N. L. R. B. v. Spartanburg Sportswear Co., 4 Cir., 246 F.2d 366, 367.

any union to compel the employer to recognize its authority or to engage in negotiations for a labor contract or to call men off the job because the work was not being performed by union labor. The company on its part felt free to carry on the business without dealing with the unions, indeed it had no union contract for the job, but it had no objection to hiring union men and sought the help of the union leaders to secure an adequate labor force. The unions on their side made no attempt to deal directly with the employer but were, nevertheless, willing to enter into an arrangement to secure employment for unemployed union workers by dealing indirectly with the employer through the State agency; and they made no attempt to restrict the employment to union men but permitted their members to work side by side with non-union employees. Except for the trivial incident involved in this case, the relationship between management and men was peaceful throughout and satisfactory to both sides; and even that incident did not involve a dispute with the Teamsters Union, since the business agent of the union was acting on his own authority without consultation with the head office of the organization. Under these circumstances it is difficult to find any motive on the part of the employer to promote membership in any union or any inherent difficulty in accepting the explanation that Mattingly was discharged for purely business reasons.

Ignoring these considerations the Trial Examiner made two assertions in support of his argument that Davis was desirous of promoting union membership in the Laborers' union. He said, one, that Davis recognized trade jurisdictional lines laid down by the Building Trades Unions and adhered to the prevailing wage rates in union contracts; and, two, that Davis employed only union members or men who were not objectionable to the union. In respect to the jurisdictional matter, the examiner relied on the testimony of Davis to the effect that he paid the prevailing wage scale and observed jurisdictional lines of the unions to the extent of putting a carpenter on a carpenter's job and an iron worker on an iron worker's job. He explained that he followed this practice because he desired to obtain men most capable of performing the various kinds of work to be done; and he endeavored to testify that he would have used men outside of their regular trade if they had the capacity to perform the desired work, but the examiner refused to admit this testimony. It is plain that Davis's practice in this respect was merely what any practical man would have done under like circumstances and furnishes no basis for the Trial Examiner's contention that Davis's predominant purpose was to favor the union.

Moreover, Davis gave the additional testimony that he put the most capable men on each job, irrespective of union membership, and made no inquiry whatsoever as to the union relations of any of his employees and had no knowledge on the subject. This testimony was entirely uncontradicted and yet no mention is made of it in the Trial Examiner's report. To the contrary, the examiner made the explicit finding that Davis could not help know or believe that the men referred by Robertson were either members of the union or at least unobjectionable to the union. It is of course a fair inference that Davis had reason to believe that many of the employees were union men since he had communicated with the unions in order to obtain their services; but there was positive testimony by the manager of the State agency that, in complying with the company's requests, he did not confine himself to union men but sent men to Davis who were not members of the union, and that at no time in their negotiations did Davis make it a condition that only union men should be sent to him. The testimony of this witness, who was found by the Trial Examiner to be worthy of belief, was not disputed; and hence it is established beyond any doubt that non-union men not selected by the union and not approved by them were employed on the

job. Yet no mention of this important fact is made in the Trial Examiner's report and the reader is lead to believe that Davis employed no men who were not approved by the unions.

It is clear that the rejection of Davis's testimony and the finding that Mattingly was discharged in order to encourage membership in the Laborers' union were based on selected portions of the record and not on the record as a whole, and hence we cannot accept the decision of the Board as establishing that the burden of proof resting upon the General Counsel has been met. See N. L. R. B. v. Shen-Valley Meat Packers, 4 Cir., 211 F.2d 289, 292; N. L. R. B. v. Amalgamated Local 286, 7 Cir., 222 F.2d 95, 97.

The petition for enforcement must therefore be dismissed.

Petition dismissed.